AO 91 (Rev. 10/95) Criminal Complaint

# UNITED STATES DISTRICT COURT

**FILED**

### EASTERN   DISTRICT OF   CALIFORNIA

JUL 1 0 2013

—oOo—

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

**UNITED STATES OF AMERICA**

**v.**

**OREST SHAYNYUK**

2 1 3 - MJ - 0 2 0 7   KJN

## CRIMINAL COMPLAINT

CASE NUMBER:

**(Name and Address of Defendant)**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. In Sacramento County, in the Eastern District of California defendant did,

- **on or about June 29, 2013, did, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States, knowingly attempt to persuades induce, entice, or coerce any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense;**

in violation of **Title 18, United States Code, Section 2422(b)**. I further state that I am a Special Deputy United States Marshal, assigned to the Sacramento Internet Crimes Against Children Task Froce, and that this complaint is based on the following facts:

- **See Attached Affidavit**

**X**   Continued on the attached sheet and made a part hereof.

Signature of Complainant JAMES WILLIAMS
Special Deputy U.S. Marshal
Sacramento ICAC Task Force

Sworn to before me, and subscribed in my presence

July 9, 2013                                                          at          Sacramento, California

Date                                                                                City and State

KENDALL J. NEWMAN

United States Magistrate Judge

Name and Title of Judicial Officer                                    Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, JAMES WILLIAMS, being duly sworn, depose and state:

1. I am a Detective with the Sacramento County Sheriff's Department (SSD), presently assigned to the Sacramento Internet Crimes Against Children (ICAC) Task Force. I have been assigned to the Sacramento ICAC Task Force since August 2001. I have been employed by the SSD since April 1991. In August 2006, I was cross designated as a Special Deputy United States Marshal. As part of my daily duties as a Detective, I investigate criminal violations relating to child exploitation and child pornography including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2251 and 2252. I have received training in the area of child pornography and child exploitation and as part of my duties have observed and reviewed numerous examples of child pornography and visual depictions of minors engaged in sexually explicit conduct (as defined in 18 U.S.C. § 2256) in all forms of media, including computer media. I have attended numerous courses in the investigation of child sexual exploitation, child pornography, and online child sexual exploitation.  In the course of my duties I have been the investigating officer and Affiant of over 100 applications for search warrants relating to numerous child pornography investigations.

2. I also have provided instruction to both law enforcement and civilians in the area of Internet security, online child exploitation, as well as social networking sites, such as MySpace and Facebook. I have received extensive training in the areas of computers and computer forensics, and I am considered a subject matter expert in high technology crimes and child exploitation. I have certifications from the Robert Presley Institute of

12-117390
305B-SC-2817991

Criminal Investigation in the investigation of High Technology Crimes. As a subject matter expert, I have assisted with the development of California Peace Officer Standards and Training (POST) telecourses for these subjects. I have also written and distributed, nationwide, several papers in regards to investigations of Peer to Peer file sharing investigations.

3. This Affidavit is made in support of an application for an arrest warrant for OREST SHAYNYUK, currently residing at ⌐                                    t, Fair Oaks, CA 95628 (hereinafter "SUBJECT").

4. I believe there is probable cause to believe that the SUBJECT has committed a violation of 18 U.S.C. § 2422(b), which makes it a crime to use the mail or any facility of interstate or foreign commerce to knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so.

5. I am familiar with the information contained in this Affidavit based upon my experience and training, my conversations with other law enforcement officers who have engaged in numerous investigations involving child pornography, and the investigation I have conducted.

6. Because this Affidavit is being submitted for the limited purpose of securing a n arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that the SUBJECT has violated 18 U.S.C. § 2422(b). Where statements of

12-117390
305B-SC-2817991

2

others are set forth in this Affidavit, they are set forth in substance and in part.

## Definitions

7. "Child Pornography" includes the definition found at 18 U.S.C. § 2256(8), and is any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

8. As used in this affidavit, "child erotica" means materials or items that are sexually arousing to certain individuals but that are not in and of themselves obscene or do not necessarily depict minors in sexually explicit poses or positions. Such material may include non-sexually explicit photographs (such as minors depicted in undergarments in department store catalogs or advertising circulars), drawings, or sketches, written descriptions/stories, or journals.

9. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

10. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

11. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, genital-anal, or

12-117390
305B-SC-2817991

3

oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

## The Internet and Definitions of Technical Terms Pertaining to Computers

12. As part of my training, I have become familiar with the Internet (also commonly known as the World Wide Web), which is a global network of computers[1] and other electronic devices that communicate with each other using various means, including standard telephone lines, high-speed telecommunications links (e.g., copper and fiber optic cable), and wireless transmissions including satellite. Due to the structure of the Internet, connections between computers on the Internet routinely cross state and international borders, even when the computers communicating with each other are in the same state. Individuals and entities use the Internet to gain access to a wide variety of information; to send information to, and receive information from, other individuals; to conduct commercial transactions; and to communicate via electronic mail ("e-mail"). An individual who wants to use Internet e-mail must first obtain an account with a computer that is linked to the Internet (through a university, an employer, or a commercial service such as an "Internet Service Provider" or "ISP" [see definition of "Internet Service Provider" below]). Once the individual has accessed the Internet, that individual can use Internet mail services, including sending and receiving e-mail. In addition, the individual can visit web sites (see definition of "web sites" below), and make purchases on the web sites.

---

[1] The term "computer" is defined by 18 U.S.C. § 1030 (e) (1) to mean "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device."
12-117390
305B-SC-2817991

13. Set forth below are some definitions of technical terms, used throughout this Affidavit, pertaining to the Internet and computers more generally.

    a. <u>Computer system and related peripherals, and computer media</u>: As used in this Affidavit, the terms "computer system and related peripherals, and computer media" refer to tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives and other computer-related operation equipment, digital cameras, scanners, in addition to computer photographs, and other visual depictions of such Graphic Interchange formats, including but not limited to, JPG, GIF, TIF, AVI, and MPEG.

    b. <u>Digital device</u>: includes any electronic system or device capable of storing and/or processing data in digital form, including central processing units; laptop or notebook computers; tablets computers and personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones, including internet capable smart phones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips; and security devices.

    c. <u>Image or copy</u>: An accurate reproduction of information contained on an original physical item, independent of the electronic storage

device. "Imaging" or "copying" maintains contents, but attributes may change during the reproduction.

## Computers and Child Pornography

14. Based upon my own knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, the development of computers and cellular phones has also revolutionized the way in which individuals entice minors to engage in sexually explicit conduct, and how individuals gather and maintain collections of child pornography. Computers serve three basic functions in connection with child pornography: production, communication and distribution, and storage. More specifically, the development of computers has changed the methods used by child pornography collectors in these ways:

   a. Production: Producers of child pornography can now produce both still and moving images directly from a common video or digital camera. The camera is attached, using a device such as a cable, or digital images are often uploaded from the camera's memory card, directly to the computer. Images can then be stored, manipulated, transferred, or printed directly from the computer. Images can be edited in ways similar to how a photograph may be altered. Images can be lightened, darkened, cropped, or otherwise manipulated. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store, and distribute child pornography. In addition, there is an added benefit to the pornographer in that

12-117390
305B-SC-2817991

6

this method of production does not leave as large a trail for law enforcement to follow.

b.  Communication and Distribution: The Internet allows any computer to connect to another computer. By connecting to a host computer, electronic contact can be made to literally millions of computers around the world. In addition, the Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in child pornography; and (ii) web sites that offer images of child pornography. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with minors, communicate with others who have similar interests, and to share images with both groups. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet. Sometimes the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache[2] to look for "footprints" of the web sites and images accessed by the recipient.

c.  Storage: The computer's capability to store images in digital form makes it an ideal repository for child pornography. A single floppy disk can store dozens of images and hundreds of pages of text. The

---

[2] "Cache" refers to text, image and graphic files sent to and temporarily stored by a user's computer from a web site accessed by the user in order to allow the user speedier access to and interaction with that web site.
12-117390
305B-SC-2817991

size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 80 gigabytes are not uncommon. These drives can store thousands of images at very high resolution. Magnetic storage located in host computers adds another dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and save that image to storage in another country. Once this is done, there is no readily apparent evidence at the "scene of the crime." Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

## Probable Cause to Arrest the SUBJECT

*G. DOE Investigation – October 2012*

15. I was conducting an investigation in regards to a minor child G. Doe (hereinafter "DOE"), who had reported that she had been contacted by a subject identified as "Oree". "Oree" initially contacted DOE via a website called www.MeetMe.com. Following the initial communication between DOE and "Oree" on www.MeetMe.com, the communication was moved to KIK Messenger. KIK Messenger is based in Canada, and allows for instant messaging and file sharing. KIK Messenger works on mobile devices such as smart phones, tablets, and iPod touch devices.

16. In the initial report written by Deputy Loggins #1071, DOE said that on October 25, 2012, she went home sick from school and was contacted via text message by "Oree," a person she had previously met online. DOE reported that "Oree" showed up at her residence and forced her to have sex with him at knifepoint. Deputy Loggins questioned DOE about assertion, and DOE then stated that she had lied about being forced to

have sex with "Oree." She eventually told Deputy Loggins that she had agreed to have sex with "Oree."

17. DOE consented to Deputy Loggins reviewing her cell phone. During this review, a contact was identified with the name of "Oree." DOE stated that this contact was for the person she had met on the internet and had sex with. The phone number for this contact was 916-xxx-9548.

18. DOE also told Deputy Loggins that "Oree" had sent pictures of himself to her, and that she had taken nude pictures of herself and sent them to "Oree." DOE also stated that they "sexted" with each other.

19. Based upon this initial report, I made arrangements for DOE to be forensically interviewed at the Sacramento County Special Assault Forensic Evaluation Center (SAFE Center).

20. DOE was interviewed by forensic interviewer K. Berardi. During the interview, DOE stated the following:

    a. I met some guy on the Internet last October and had sexual contact with him. It happened one time. I was talking to him on a website called MeetMe.com. He sent me a message and then we moved to KIK.

    b. MeetMe is a meeting people website. I don't remember how the conversation started but he asked me for my KIK name. KIK lets you text from your phone. We started "KIK'ing" or talking.

    c. He sent me pictures and I sent him pictures. He sent me like 8 pictures - they were all of his penis. I don't remember how many I

12-117390
305B-SC-2817991

sent to him, there was more than one. I just sent pictures of my boobs. I don't remember because it was so long ago.

d. His name was Oree and he said that he lives in Fair Oaks with his dad. He's about 20 or 21. He knew how old I was because he asked me and I told him that I was 12. I told him I was 12 when we were on KIK. His MeetMe Profile said that he was 15 or 16, but on KIK he told me that he was actually 20.

e. When we met on MeetMe, he asked me for my KIK name right away. After a couple minutes from being on KIK he started sending me pictures. It was like that was all he was on KIK for was to send pictures. I don't remember what he said when he said let's meet in person. It was a couple days after sending pictures to meeting. It was his idea to meet. He asked me for my address and I gave it to him. I was at my house alone and he texted me and said that he was here. It was around 3 pm.

f. His car was parked in front of my house. It was a white box type car - maybe it was a Scion. He told me to get into the back seat and he got out and got into the back seat too.

g. He was wearing a striped shirt and some pants. I was wearing the clothes that they took from me. He told me to take my clothes off and stuff like that. I took off my shirt, pants and underwear, but I left my bra on. He took his pants and underwear off. He was sitting in the back seat normal and I was sitting next to him in the middle.

h. He started to finger me with his hand using two fingers. He was using his fingers in my vagina. He asked me to give him a handjob,

so I used my hand on his penis. He was still fingering me when he asked.

i.   Then he said that I should bend over, so I got onto my hands and knees in the back seat. My hands and knees were both touching the back seat and he was behind me. He tried to put his penis into my vagina. He didn't put anything on his penis before that. When he put his penis into my vagina it hurt.

j.   He tried to put his penis in my butt but I told him not to. He touched my butt cheek with his penis. I could tell because his penis was touching my butt. He put it in my vagina at first and it hurt, so he tried to put it in my butt.

k.   I was just sitting there because I didn't know what to do. Afterwards we were just talking and stuff. Nothing came out of his penis, I didn't feel anything. Nothing came out of me. After we were done, he said let's keep it a secret because of our age difference.

l.   DOE had initially stated to Deputy Loggins that "Oree" had her orally copulate him prior to have vaginal sex with her. DOE was asked about this during the forensic interview and she stated that "Oree" had asked her to give him a "blowjob" but she said no. DOE had also stated to Deputy Loggins that "Oree" had ejaculated inside her vagina but did not repeat this statement during the forensic interview.

21. During the forensic interview. DOE offered to show the forensic interviewer an image of "Oree" on her cell phone. Following the forensic interview, I asked DOE to show me the image of "Oree" and she showed me the same image.

12-117390
305B-SC-2817991

22. I sent an administrative subpoena to Verizon Wireless, the provider for the phone number 916-xxx-9548 ("Oree" phone number), for the subscriber information and call detail records as well as text detail records. I received the requested information and saw that the subscriber information was:

Vladimir K. Shaynyuk

In addition, between October 7, 2012, and October 11, 2012, there were nine (9) calls between the Oree phone number and DOE's phone number. During that same time period, there were approximately fifty-three (53) text messages between Oree's phone number and DOE's phone number. Verizon does not keep text message, so a search warrant for this information was not sought.

23. I conducted a public records check on the address listed for the subscriber, 8490 London Plain Ct., Fair Oaks, CA. This public records check showed that there were four people who had listed that address:

Vladimir K. Shaynyuk, date of birth
Vera Shaynyuk, date of birth 1
Girogio V. Shaynyuk, date of birth
Orest W. Shaynyuk, date of birth

24. A search of the Sacramento County Known Person system only showed Orest Shaynyuk living at that address.

25. I conducted a search on Facebook for Orest Shaynyuk and located a subject with that name with a profile at

https://www.facebook.com/orest.shaynyuk. This profile had the same photo that DOE had shown me following her forensic interview.

26. On Monday, May 27, 2013, I drove by the residence and observed a white Scion parked in the driveway, a white Toyota Prius parked in the eastern portion of the driveway, and a silver BMW parked in the garage with the garage door half open. In addition, as detailed below, a Mercedes and Scion sedan were also in the area.

   a. The BMW's license plate was 5GRM458, which returned to Vladimir Shaynyuk, 8490 London Plain Ct., Fair Oaks, CA.

   b. The Scion's license plate was 6MCA579, which returned to Orest Shaynyuk, ₹         This vehicle matched the description of being a "box" type vehicle.

   c. The Toyota Prius' license plate was 6AOK533, which returned to Vladimir Shaynyuk, ⌢

   d. There was a dark colored Mercedes parked on the street, CA license plate 6CQL072, which returned to Vladimir Lutsik, ⌢⌢⌢ ⎯ ⎯ ⎯ ⎯, ⌐⌐, ⌐⌐⌐⌐ ⌐⌐⌐⌐⌐⌐⌐, ⌐⌐⌐.

   e. Parked on the side of the residence (on Kenneth Ave.) was a dark colored Scion sedan, CA license plate 6AOK533, which returned to Vladimir Shaynyuk, ⌢⌐⌐⎯ ⎯

27. On Tuesday, May 28, 2013, I drove by the residence and saw that there was a white Toyota Prius, CA license plate 6PFA887, parked in the driveway. This vehicle returned to Alona Masevich,

28. At this time, I took photographs of the front of the residence. As I was returning to Kenneth Ave., I saw a white Scion box-like car coming south on Kenneth Ave. I saw this vehicle turn onto London Plain Ct. As I drove by the SUBJECT PREMISES again, I saw a white female exit the vehicle.

29. Driving by the residence shortly after, I saw that the far west garage door was partially opened and the BMW was still parked in the garage. I later saw this same female leave the residence walking a small dog. A check of DMV for Vera Shaynyuk showed a female who appeared to be the same one I saw exiting the white Scion.

30. A SMUD customer information request was submitted and identified Vladimir Shaynyuk as the customer for

31. In furtherance of this investigation, I retrieved DOE's cell phone and iPod which had been seized as evidence during the initial investigation. I obtained verbal consent from DOE's mother to search both of these items.

32. I reviewed the files that were found on DOE's iPod Touch (Item JL-1) by Investigator G. Vasiliou. Several images of DOE naked were located.

33. I reviewed the images and saw the following:

   a. IMG_5026.jpg: This was a color image of DOE topless with her tongue sticking slightly out. This file was created on October 15, 2012 at 10:38:40 PDT.

   b. IMG_5004.jpg: This was a color image of a girl's buttocks. There is a bluish green marker that appears to be inserted into the girl's vagina.

On the girl's right buttock is writing in a bluish green ink that appears to be "Orest" with a heart after the "t". This file was created on October 15, 2012 at 07:09:33 PDT.

c. IMG_4998.jpg: This was a color image of a girl's breasts with the girl's shirt pulled up. The girl's face is not visible. This file was created on October 14, 2012 at 14:05:20 PDT.

d. IMG_4969.jpg: This was a color image of DOE standing on a bed naked holding what appears to be her iPod. DOE's genital area is visible in this image. This file was created on October 14, 2012 at 11:11:44 PDT.

34. A check of DOE's phone was also done (this item was also booked under evidence number JL-1), but there were no messages related to the conversation with "Oree" in the KIK messages. There was a significant block of messages which were missing and it appeared that messages had been deleted prior to the phone being seized. During the initial statement to Deputy Loggins, after admitting that she had lied about being forced to have sex at knifepoint, DOE said that she had deleted all of her KIK and text messages from "Oree" from her iPod touch and cell phone. The gap in messages that I observed was consistent with this statement about having deleted messages.

35. Based upon your Affiant's training and experience and in talking with other investigators, I know that it is possible to recover some deleted messages from applications like KIK Messenger. Although the messages that were related to the conversation with "Oree" were not recoverable in this instance, depending on the device and when the messages were deleted, KIK messages may be recoverable from other devices. Furthermore, "Oree" has not been contacted by law enforcement in regards to this investigation to date. As

12-117390
305B-SC-2817991

15

explained more fully below, in my training and experience investigating individuals who acquire images of child pornography and seek contact with children, it is possible that "Oree" may not have deleted the his conversation with DOE from the device he was using. This is also possible because of the fact that KIK Messenger will allow for multiple conversations to be stored and a user would have to intentionally select a conversation and delete it.

*I. DOE Investigation – July 2013*

36. On July 1, 2013, I received an automated notification from the Sacramento County Sheriff's Department Known Person system that the records associated with Orest Shaynyuk had been accessed by Andre Booker, Rocklin Police Department. As a result of the G. DOE investigation, I had placed Orest Shaynyuk on a watch list in order to determine if he was contacted by any law enforcement agencies.

37. I contacted Det. Rich Cabana, Rocklin Police Department, via email and asked him to check to see why Shaynyuk's records had been accessed. On July 5, 2013, Det. Cabana responded that Rocklin Police also had an investigation pending with Orest Shaynyuk as the suspect. Detective Cabana provided me with the contact information for the investigator, Det. Costa.

38. On July 8, 2013, Det. Costa provided me with a copy of the Rocklin Police report 13-180-12, which I reviewed. According to the report:

   a. Rocklin Police Officer Powell was dispatched to a statutory rape incident involving I.DOE, a 15-year-old girl. Officer Powell spoke with I. DOE's mother, S. DOE. S. DOE said that she found a text message on her daughter's phone from an unknown person, and that she began answering the texts in an attempt to figure out who her daughter was communicating with.

12-117390
305B-SC-2817991

16

39. I. DOE's cell phone was seized and S. DOE consented to a search of the phone. I reviewed the messages on I. DOE's Apple iPhone and saw the following iMessages between I. DOE's phone and a contact named "Breeana". (It was determined later that I. DOE had listed Shaynyuk as "Breeana" in order to conceal his identity.) iMessages are instant messages that are sent using data versus text messaging. When sent between Apple devices, these messages do not show up as text messages on a cell phone provider's records. On the iPhone I observed the following:

   a. There were two messages on June 27, 2013 asking "home alone?" one at 3:04 PM and one at 9:34 PM.

   b. On June 29, 2013 starting at 5:27 PM, were the following texts exchanged between a person identifying themselves as "Orest" and S.DOE (posing as I.DOE)

| SENT | RECEIVED |
|---|---|
| | Hi |
| | I lost my contacts who is this |
| Orest | |
| Wanna fuck? | |
| | When |
| Right now, I'm horny af | |
| | K |
| Can I come over? | |
| | I'm at my moms |
| Where's that | |
| | In Rocklin |
| Where | |
| | My mom droping me at my dads at 6:30 |
| So when can we | |
| | Ill be alone |
| Really? For how long? | |

| SENT | RECEIVED |
|---|---|
| | About an hour |
| | Are u coming |
| | Ha ha |
| Maybe ;) you home? | |
| | No not yet |
| When | |
| | In 30 |
| | I'll text when I'm on my way |
| | Phone die. I'm home |
| Prove it(; | |
| | (A color picture of I. DOE's face was sent.) |
| Take it off | |
| | You can see it when you get here;) |
| Don't be boring lol | |
| | You kno I'm not haha |
| Anal today? (: | |
| | I don't know |
| Why | |
| | Because it hurt last time you tired it |
| Lol sorry ;) excuse my big Dick (; | |
| | We can try I guess |
| Send me some pus | |
| Pics | |
| | Can you just come over I'm horny |
| | So are you coming or not? |

40. The contact information that was listed for "Breeana" was 916-xxx-9548. This was the same phone number which was previously associated with Orest Shaynyuk.

41. Officer Powell took a statement from I. DOE who stated the following, in summary:

    a. I met "Orest" online on a website called "meetme.com" around July 2012. I told him that I was 15 years old. I think that he's around 20 years old. We started texting soon after meeting online and on

occasion I would send nude pictures of myself to him. We first had sex in January 2013 at his house. I think it's in Citrus Heights somewhere. He picked me up from my apartment. I can't remember how to get to his house. We had sex again in April 2013 at my apartment in Rocklin. I have not spoken with him since then and those are the only two times that we had sex. We didn't do anything other than have sexual intercourse and he used a condom both times.

b. I only know him as "Orest" and only have his phone number of 916-xxx-9548. He drives a white "box-car" like a Scion XB or Nissan Cube. He's a white male, 5'-2", with short blond hair.

c. I deleted all of my internet messages on Meetme.com and all of the previous text messages.

42. Detective Costa also told me that I. DOE had been contacted by Rocklin Police Department in 2011 in regards to taking images of herself naked and sending them to adult men. Rocklin Police investigated this and documented that images of I. DOE had been taken and sent to various males. I. DOE was listed as a victim and no prosecution resulted from this investigation. I. DOE was 13 at the time of this incident in 2011.

43. I reviewed the data recovery that was performed by Rocklin Police Department on I. DOE's iPhone and saw that there were images of I. DOE both topless and completely naked on her phone.

44. I located a MeetMe.com profile for Oree, which had a photo similar in style (shirtless, laying on a pillow type object) to the image that was used for the Facebook profile picture for Orest Shaynyuk.  This MeetMe. Com

12-117390
305B-SC-2817991

profile describes "Oree" as being a 16-year-old male in Fair Oaks, California. This profile was identified by the profile ID of 46673422. I sent MeetMe.com a preservation request for this account in order to preserve any communications that may be located on MeetMe.com servers.

45. Based upon I. DOE's statement regarding Orest Shayyuk's residence in Cirtus Heights, California, it should be noted that Orest Shaynyuk's residence is located in Fair Oaks, California, near the east border of the City of Citrus Heights.

*Information about MeetMe.com*

46. MeetMe.com allows users from as young as 13 up to create an account. Depending on the age of the user's profile, MeetMe.com will allow for them to search for an age range. For example a profile for a user that is 14, can search for ages from 13 – 16; a 17-year-old profile can search for ages from 15 – 19; and a 45-year-old profile can search for ages from 23-99.

*Background about Persons who Contact Minors / Seek Child Pornography*

47. The undersigned Affiant submits that there is probable cause to believe that an individual found to be utilizing the computer located at the SUBJECT PREMISES has acquired child pornography from victims G. DOE and I. DOE, and has enticed those minor females to engage in sexual acts in violation of law. Given your Affiant's knowledge and investigative experience related to the habits and tendencies of those who have contact with children and engage in sexual acts with children, I believe the following:

a. Individuals who have contact with children often keep records or trophies of that contact. This includes pictures and communications with minors that they have sexually exploited. These pictures may be maintained in various media along with other collections of child pornography or other material involving the sexual exploitation of minors.

b. All known communications between the victims in this case and Orest Shaynyuk occurred through computers, cell phones, or other digital devices, or in person. As such, it is likely that any records of contact with G. DOE and I.DOE, or with any other unknown victims, are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area. These communications and any collections of child pornography are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

c. Individuals involved in the sexual exploitation of minors may correspond with and/or meet others to share information and materials; rarely destroy correspondence from others involved in the sexual exploitation of minors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests.

48. Your Affiant also bases this opinion on his investigative experience gained during the execution of previous search warrants related to individuals who have used the Internet to entice minors to engage in sexually explicit

conduct, and who have acquired images of minors engaged in sexually explicit conduct.

49. Finally, based upon the conduct of individuals who have used the Internet to entice minors to engage in sexually explicit conduct, and who have acquired images of minors engaged in sexually explicit conduct, there is a probable cause to believe that evidence of the offenses of attempted transportation, receiving, and possessing child pornography is currently located at the SUBJECT PREMISES.

50. Your Affiant knows from training and experience that peace officers or assigned representatives should videotape, photograph and/or digital image the location during the execution of this search warrant. The Affiant needs control of who takes the images. Computer(s) at the scene may be operating during the service of the search warrant. The images on the computer(s) screens are transient, it may be necessary to video tape, photograph and/or digital image the computer monitor screen(s). Photographing of the location, vehicles and persons present at the scene is often helpful in the showing possession of the premises and evidence. It is also good to show the condition of the location as the search warrant is served and to show the condition of the location after the search warrant has been served.

## Conclusion

51. Based upon the above information, there is probable cause to believe that the SUBJECT has violated 18 U.S.C. § 2422(b) which makes it a federal crime for any person to knowingly possess, receive, or attempt to transport visual depictions of minors engaged in sexually explicit conduct, and to knowingly persuade, induce, entice, or coerce any individual who has not attained the age of 18 years, to engage in prostitution or any

12-117390
305B-SC-2817991

22

sexual activity for which any person can be charged with a criminal offense, or attempts to do so.

52. The SUBJECT is currently not in United States custody. Accordingly, in order to avoid alerting the SUBJECT of this investigation and to prevent both his possible flight and the potential destruction of any evidence that he may be in possession of. The United States requests that the Court order this search warrant and search warrant affidavit be kept under seal until further order of the Court. Without such an order, individuals may conceal, damage, or destroy evidence sought by this search warrant prior to its execution.

JAMES WILLIAMS
Special Deputy United States Marshal
Sacramento ICAC Task Force

Approved as to form.

KYLE REARDON
Assistant United States Attorney

Subscribed and sworn to before
me this __9th__ day of July 2013

KENDALL J. NEWMAN
United States Magistrate Judge
Eastern District of California
Sacramento, California

12-117390
305B-SC-2817991

23